Yes, Your Honor. I represent Mr. Brewer with the Western District of Arkansas Federal Public Defender's Office. And as a matter of housekeeping, Your Honor, I would request three minutes for rebuttal. Additionally, Your Honor, as a matter of housekeeping, I think that the issue before us here is very narrow. I would suggest that given the decision, the KUHL matter, I may not be pronouncing that quite right. K-U-E-H-L. I think the issue of non-delegation is pretty much off the table for today. So I really do not intend to address that. It was mentioned in our brief for preservation of appeal purposes. We won't mind if you talk slower and, but more importantly, louder. Yes, sir. Raise the microphone right up in front of your face. Would you raise the microphone a little bit with that button or other side there? Thank you very much. I apologize. I'm normally not so soft-spoken. As I was stating, I think that the non-delegation doctrine is pretty much off the table for us today. As I see the issue before us today is whether the interim rule was violated by the Attorney General on the February 28, 2007 interim rule that was published by them. We see the issue really very well developed in the Reynolds 2 decision by the Third Circuit. We see that as pretty clear from the majority of the circuits that we've researched that the Attorney General's office has failed to show good cause as to why they should not be required to follow the procedure set forth under the Administrative Procedures Act. I think that even the Johnson decision, which is relied on by the government, also notes that the government has failed to show good cause. So we see the issue really more as to the nature of harm, whether prejudice has been shown. As noted also in the Reynolds 2 decision, we think that there's an issue of burden shifting here because this is a criminal case. The Johnson case out of the Fifth Circuit did not deal with the burden shifting. They just simply saw that there was no good cause and, as in civil matters, left the burden on the defendant to show that he was harmed. However, as noted in the Reynolds 2 decision, we see it as being correct and shifting the burden to the government. Historically, as far as Mr. Brewer is concerned, he is a pre-SORNA sexual defender. In approximately 1997, he was convicted of an offense out of Hawaii, which would have required him to register. As more clearly set out in the briefs in the timeline, he ultimately moved to Arkansas at one point in 2004. He moved to South Africa, and then he moved back to Arkansas on December of 2007. At that time, SORNA had been passed by the Congress in July of 2006, but there was no procedure or no condition or requirement in the original SORNA to require pre-date offenders to be required to register. They left that open for the Attorney General to set forth an appropriate rule to make that determination. I think U.S. v. Carr and even Reynolds 1 also talks about these gentlemen are not subject—pre-date defendants—are not subject to the SORNA unless and until a valid rule has been promulgated by the AG. So that's kind of the setup here. Again, as I indicated and is pretty well covered in the brief, we think that the issue is one of whether there was harm. And I don't want to just try to regurgitate everything that's covered in the briefs. I think the briefs well present the issue by both us and the government. At this point, Your Honors, I'd be happy to address questions. I'm not sure what you're interested in focusing on. And when you say was there harm, does that mean that we find that there was harmless error? Well, I think that you can't— You would say no, of course. Where was the harm here? To the public or to Mr. Brewer? It's both because since the AG had an utter failure to comply with the APA and had no notice and comment—they did not make the notice and comment requirements. They just simply promulgated the rule and said, hey, we have good cause. We think that it applies, period, end of story. But as noted in the Reynolds 2, there was this burden shifting. And because this is a criminal matter, because a liberty interest is at stake, we think that's appropriate for the government to not for the defendant to have to prove that there was. When you said it's a complete failure, so they had no notice and comment, period, what if it had been something less than that or more than that? It had been maybe a technical error or something was left out of the process. How do we assess that? Well, I think that Reynolds 2 decision, which obviously we're relying very heavily, covers that as a particular issue. But because it is an utter failure, I mean, there's no ifs, ands, or buts. There was no notification. There was no comment, period. It's not really even debatable. So your position, it's per se? It is. I think that as some of the other courts had found, even the Fifth Circuit and Johnson found, that there was no good cause. But the issue then shifts to, well, then who's going to have to show the harm or absence thereof? But you're saying because there was absolutely no notice and comment, it doesn't really matter? That's correct. And would that be for criminal and civil? Well, without addressing the civil arena, I would certainly say it would be for criminal. We have a liberty interest at stake that you don't have in a civil matter. We look at some of the other cases that I think the Hawaii helicopter case and others cited in the brief. This is not a civil matter. This is strictly criminal. And again, we rely heavily on Reynolds II, which gives a very in-depth discussion about it. It talks about the difference in the circuit splits and the other matters. I'm not trying to avoid the question, but I would say that it's really dealt with well in the brief. So yes, I mean, it's a criminal matter. We think that the government bears the burden. What credence, if any, should we give the Attorney General's determination that there was a good cause to dispense with notification? Well, I would say none. The reason that I say that is, any agency could jump on the same bandwagon and say... Well, that's easy to say, but do they? Do they? Frequently? This is an endemic problem with the government? Well, I don't know how epidemic it is, but it certainly... This is a case that I think that there's materials that would indicate that this affects literally thousands or hundreds of thousands of defendants. So, I mean, without focusing on how many times it's happened elsewhere, I mean, we're pretty much myopic on this particular point. Well, wasn't the Attorney General responding to pretty clear directions from Congress, that Congress took this matter pretty seriously? Well, I would like to say that, but it appears that... Why did the Attorney General wait seven months from the enactment of SORNA to apply the interim rule? It appeared that it was really just... In other words, you're arguing it's not like acting within 30 days of the Twin Towers? Correct. They have... Certainly, they have the personnel and the ability and the funding to make quick decisions and move quickly. I think the Attorney General's timing made it appear that it was a foregone conclusion. They were just simply throwing it out there saying, okay, it's a retroactive period in the story. I don't think that it believed it had to follow those procedures. I think that the timing indicates that they reacted very hastily, and I think the interim rule, as indicated in the Reynolds 2, demonstrated a single-minded commitment to its desire to make the subsequent result... The ends justify the means type of position. And that's not always fatal, is it? Well, that's a rhetorical question. Do you want to reserve the rest of your time for rebuttal? Certainly. Thank you. You may do so. We'll hear from the government. Ms. Taylor? Good afternoon, Your Honors. May it please the Court, esteemed opposing counsel, my friend, Mr. Pierce. The district court properly denied the defendant's 2255 motion in this matter in ruling that the promulgation of the interim rule without the 30-day notice and comment period was not a violation of the APA. SORNA delegated authority to the Attorney General to determine the applicability of SORNA to the pre-enactment sex offenders. The central question then is, when did that promulgation actually become effective? We would assert today that it became applicable on February 28, 2007, when the Attorney General's interim rule was promulgated and the Attorney General at that time had good cause to bypass the notification and comment provision of the APA. The APA requires publishing notice and comment of proposed rulemaking in the Federal Register at least 30 days prior to the promulgation of the rule. Also, it requires that interested persons, pardon me, are given an opportunity to make comment and participate in the process. But the APA also allows that this can be bypassed, this notice and comment period can be bypassed if good cause exists, and that good cause is either impracticability, that it's unnecessary, or third and I think most important in this instance, contrary to the public interest. And I would assert that in the SORNA case or the SORNA interim rule, the Attorney General had good cause for dispensing with the 30-day notice and comment period and that he voiced it in his comments to the February 28th interim rule. He alleged multiple reasons, I would assert, not just one, and that those multiple reasons should be read together as the Dean case intimated. The first reason that the Attorney General gave was immediate guidance on pre-SORNA sex offenders and SORNA's applicability to them. Was it immediate? What about the seven-month delay? That seven-month period is certainly troubling. But what I would say to that is, I think the Attorney General's office had seven months to realize, based on the litigation that was coming out of SORNA, that it was not obvious that SORNA was applicable to pre-enactment sex offenders because comments by the Attorney General did seem to indicate that he believed SORNA was applicable to them upon enactment and once the litigation made it clear that that was not going to be the case, then the Attorney General had to act on that. I think there are other issues. SORNA is not just a set of laws dealing with someone's requirement to register. It is also implementing a national standard, basically, by which sex offenders are registered. Each state had their own sex offender registration laws, but they were kind of a patchwork. There's differences amongst them in terms of who had to register, how long they had to register, and things like that. And part of what I believe the Attorney General's office was doing in that seven-month period was determining and working with the states on how this is going to be enacted. So there were, I guess, other issues at play rather than just the SORNA being applicable to pre-enactment sex offenders. And I would assert that the first Reynolds case decided by the United States Supreme Court also acknowledged that part of SORNA, part of those reasons put forth by the Attorney General was that it was to ensure SORNA was applicable to all sex offenders because that was not the case till the Attorney General said so, regardless of what his thinking to this had been prior. I would also say that, just realistically speaking, it does take time for an agency to implement a rule. Certainly, there's always an argument that they could be faster or should be faster. But I would also say that whenever the rule that they're implementing deals with a violent offender or a sex offender, that there is an inherent danger to the community and a sense of urgency. So that once the agency has gone through whatever process they're going through to come to the decision, we're ready now to promulgate, that they should do so with all immediacy and that public safety demands that immediacy. What about what I think is the fact that all of the states, if not most of the states, already had registration requirements in place at that time? I think it goes back to the fact that they're all different. I know that just having been a state prosecutor before a federal prosecutor, there is a difference even in Arkansas between state laws and federal laws and that is the same across the country. So while there's some overlap, there's also gaps. So are those differences then you're saying is what caused the public safety problem? Is that the finding? I think it's a part of it. I don't think it's by any means the whole thing. I think that for one reason is that there is a gap that SORNA seeks to cover. I think the other reason is a public safety is that anytime you're dealing with unregistered sex offenders, and Mr. Brewer is a great example, then you need all the resources possible. What SORNA brought was more resources than the states had available to them. More resources and more manner and means to go about trying to locate and get sex offenders registered. Mr. Brewer is a perfect example in that before 2005, he did live in Arkansas and did register three different times. He leaves the country in 2005 and is gone for at least until the end of 2007, comes back to Arkansas and doesn't register from the end of 2007 until he's arrested in 2009. That in and of itself shows, and he's arrested by federal agents, not state. So I think we see just in that action that federal involvement achieved the goal. And that's part of what the urgency was, to put those resources out there and make them available. I would also point out that if there's not a sense of urgency and a sense of immediacy when dealing with rules related to sex offenders, then I would assert that when would public safety and security demand that immediacy? Also, the interim rule was closely followed with guidelines, which did culminate in a final rule after notice and comment. The second reason put forth by the Attorney General for dispensing with notice and comment was to protect the public. And I've talked about that some a little bit from the standpoint of knowing where your sex offenders are. If a sex offender was previously registered, then SORNA was no change in his manner or means. He would have received notice of SORNA upon his registering as he normally did. But it really mattered for unregistered sex offenders, for those reasons I talked about with having the extra resources to go about and find them, and the public's interest in knowing where they are, knowing that they're not close to schools, knowing that they're not close to playgrounds, things like that. And in protecting the public to prevent additional sexual assaults and child abuse and exploitation. SORNA's very purpose in protecting the public is mentioned in the statute at 42 U.S.C. section 16901. And in that, it talks about the state laws not being adequate. SORNA is enacted in memory of past victims. Every day not fully implemented would put the public at risk. These are all things that Congress stated when it enacted it. And I would point out that the Dean and the Gould case both recognize this. I would assert that the 4th, 7th, and 11th circuit got it right and would urge this court to follow them in finding that the attorney general had good cause for promulgating the interim rule before notice and comment. Excuse me. If the court is not inclined to follow the 4th, 7th, and 11th circuit and find that there was good cause, then I would urge you to uphold the APA interim rule on a harmless error review. And in that instance, I would ask you to follow the Johnson, the 5th circuit in Johnson, and the concurring opinion in the Dean case and find that any deviation from the APA standards listed in 5 U.S.C. section 553 were harmless. What about the fact that it really was just a void? There was just nothing. It wasn't just a technical error or something. Just a choice not to, you mean? It just was a choice not to have the notice and comment. I think that it was a choice. I mean, in the sense of there was kind of no notice and comment period at that time. However, I would argue that in the preamble and in the comments made by the Attorney General, he sort of lays out what the issues would be for notice and comment, kind of in anticipation. Here's what's been happening and here's why we're doing this. Because there had been litigation. There had been litigation over who was SORNA applicable to. That's one of the big reasons why the interim rule became necessary, because sex offenders were litigating as to whether or not pre-SORNA sex offenders could be held liable under the new statute. He does comment on that as well. I think also he mentions ex post facto in his comments. How the legislative intent would be thwarted by waiting and continuing to wait. So this is what you're saying? He gave notice in a different form? Yes, ma'am. I think that that's one way to put it. I think he laid out the anticipated issues that would come up in a notice and comment period. So where's the comment part of the notice and comment? Well, to that I would say that between then and the time the final rules were implemented, there was no substantive change to the law. Mr. Brewer, his conduct was criminal under the February 2007 interim rules and it's just as criminal today. So I would say that it's harmless error because there was no change. For individuals like Mr. Brewer. I don't know if that's really dispositive of your question or not. That's basically the only answer I think I have for that. Excuse me. I would point out that Mr. Brewer has not asserted what comments he would have made in a notice and comment period or how different they would be from what the Attorney General might have mentioned in his preamble. I would assert those facts indicate that Mr. Brewer personally was not prejudiced or harmed. In fact, rather than articulating what his harm or prejudice would be, he's just stepped back and said it's not my responsibility. And would assert that he is not prejudiced by a lack of notice and comment. Mr. Brewer's only prejudice comes from his self-induced conduct when he knowingly failed to register and abide by the sex offender laws in place. He is a perfect example of the person that the Attorney General was trying to protect the public from by immediate implementation of the law. What about the point that opposing counsel makes, the difference between criminal and civil and where that burden should lie? I think I don't have a great answer to that. I'll be up front. But I would say that the factual and legal analysis between the civil and the criminal is no different because basically it's the same legal issue. And ultimately, I think that's our overriding position. That because it is the same legal issue, there should not be a higher standard on the government. Mr. Brewer's the movement. He brought this to the district court in a 2255. And he brings it now to this court on appeal. And I believe as the movement, he bears a burden in this matter more than just saying, hey, I was wronged. And that the APA statute allows that he should show prejudice. And I think that that's the appropriate line to follow. Two quick questions. If we rule that the interim rule is invalid, is Mr. Brewer entitled to relief under 2255? If you rule that the interim rule is invalid, but don't find it was harmless error. Completely remove the interim rule, then yes, he would be. And secondly, there is no answer to this. To what extent, except for Mr. Brewer, to what extent has this become a moot problem around the country? How many Mr. Brewers are out there challenging this very same thing? Or don't you know? Or maybe it's irrelevant. Well, I can say that having litigated SORNA cases from the very beginning, but not having done so, or I should say it this way. I prosecuted SORNA cases right after its enactment in 2007, but have not done so many in the past couple of years. I can say that as each Supreme Court ruling has come down at the Carr case originally, prosecutors have become more selective. AUSAs are pickier about what we charge. So I think that there are fewer and fewer Mr. Brewers out there. And I would note that since the Supreme Court's decision in Reynolds, the Third Circuit and now the Eighth Circuit, as far as I know, are really the only ones taking up this issue at this point. It's still undecided in the 10th and the first, second and 10th, I think. So I'm not sure if that's a good answer. Okay. Well, thank you for your argument. Thank you. I suppose I'll address this before rebuttal time. I suppose both parties wonder why did we put this? Why did the court put this on for argument? Neither one of us wanted or asked for it. I don't know if there's a good answer. Well, I guess maybe there's no rule in our court as such that says we're reluctant to reverse a district court without us. And I'm not saying we're going to, but normally we have arguments. And then secondly, there is a circuit split, which makes it more than a . . . We're not creating it. We're adding to it, I suppose, one way or the other. So that may be why we're here. It seems perfectly reasonable given the . . . Have you argued before us before? I've never seen you. I have. I've had Justice . . . If you've lucked out, you've never had to argue before. Yeah. Justice Bye and Justice Beane. Yes. Thank you. Well, Mr. Pierce. Well, what about the argument that Mr. Brewer was known as Babe in the Woods.  Isn't that the case? Well, that may be true for the Arkansas law, but we're still dealing here with the federal law. And it sort of takes the sting out of a lot of his argument, doesn't it? I don't see that because of the . . . Well, I wouldn't expect you to. Well, thank you, Your Honor. But we are talking about a 10-year maximum sentence for Mr. Brewer. Well, that's true. And I would say, Your Honor, it's been 11 years since I've been here. So I'm a little out of practice, but I'm happy to try to do what I can to help the court in any way. And again, why shouldn't we follow the Fifth Circuit? You told us early on, but I've already forgotten. Well, Your Honor, I'll be happy to mention it again. I think the Fifth Circuit got half of it right. We think the Fifth Circuit, the Johnson decision, got the part about that there is no good cause to show why the APA's notice and comment section should not be followed. There's no good cause for that. Where we see the crux of the disagreement is going to be the harmless . . . whether there was harm caused and who has the burden of showing it or not showing it. We have to remember at all times while this has been going on, sexual offenders have always been subject to the Wetterling-Lack and Megan's Law, in addition to the various state laws. And I understand the government's position that there's some question to try to get some uniformity here. But one would think that as important as this issue is, that they would take their time in doing it right. When I see the issue about the AG kind of waited for litigation to occur before it was ready to do something, I'm not persuaded by that. Seven months is a long time. You're not going to get much litigation in seven months. It's got to start with the district court and work its way up to the courts of appeals and maybe even up to the Supreme Court. A seven-month period of time, from my experience, is just not realistic. And then we talk about . . . It did, but it could have acted on its own. It didn't have to wait until the Attorney General's office would give us a rule. Well, maybe they thought there was no need. Who knows? Well, I haven't reviewed the congressional record on it, but it would just seem that Congress delegated this decision to the AG. And the AG just sat around for a while and for some reason decided to publish the interim rule. It relies on this need of urgency and protection, but aren't all government agencies who are required to follow the APA, aren't they all going to simply say that their matter is just as urgent as someone else's? Well, again, I don't know. I haven't had that much experience with it. But back to the harmlessness. You, of course, argue that no one, Mr. Brewer or anyone else, should be required to offer what sort of comments he or they would have made had the publication been properly done. And I would normally agree with that, except that we know that Mr. Brewer, if the court was aware of his involvement in his own case, he's filed his own motions to dismiss. He filed his own 2255. He's been heavily involved in this matter. He has been involved more so than almost any client I've ever represented. And I'm probably past 1,000 and approaching 2,000 clients by this point. It just seems to me, just in the federal system, not including the state system. Not in SORNA cases? Oh, not in SORNA cases. No, no, no. I don't know how many of those there are. But I was privileged to have the first jury trial involving SORNA in Arkansas. So we've had a high interest in this issue from the very get-go. Any further questions? Nothing further. Well, I appreciate the opportunity. We thank you both for appearing and making your spirited arguments. We'll focus our thinking and hope we'll come out with the correct result. Thank you, Your Honor. Court will be in recess until 9 o'clock tomorrow morning.